# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **FRANK PASQUALETTI, SR.,** *et al.* | : | **Case No. 1:08-CV-02348** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **KIA MOTORS AMERICA, INC.** | : | **OPINION & ORDER** |
| **Defendant.** | : | |

Before the Court is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 18), filed by Defendant, Kia Motors America, Inc. ("Kia"). The Plaintiffs, Frank Pasqualetti, Sr. and AAH&L, Inc. (collectively, "Pasqualetti"), have filed a brief in opposition (Doc. 20), Kia has filed a brief in reply (Doc. 22), and Pasqualetti has filed a sur-reply (Doc. 23), which the Court granted him leave to file. Accordingly, this matter is ripe for adjudication. For the reasons articulated below, Kia's motion to dismiss is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This dispute relates to Plaintiff Frank Pasqualetti's attempt to buy a Kia Motors franchise and Defendant Kia's denial of Pasqualetti's franchise transfer application. Construing the facts in the light most favorable to the Plaintiff, as the Court must do under Rule 12(b)(6), Pasqualetti's allegations are as follows: Pasqualetti and his company AAH&L entered into an asset purchase agreement ("APA"), on or about June 16, 2008, to buy assets and car dealership franchises from Richard Varner and Courtesy Chrysler Dodge Kia ("Courtesy") of Ravenna, Ohio. (Doc. 2 at 2). The cost, including the APA and the Real Estate Purchase Agreement ("REPA"), to buy Varner's Chrysler, Dodge, and Kia franchises, assets, and goodwill was approximately $1.6 million dollars.

(Doc. 2 at 3).  "Pasqualetti was investing approximately $850,000 of his own private funds," and the rest of the financing was to come from a loan through National City Bank.  (Doc. 2 at 3-4).

As part of the franchise transfer process, Pasqualetti was required to apply for the franchisor companies' approval to take over Varner's franchises.  (Doc. 2 at 3).  Chrysler approved the transfer of the Chrysler and Dodge franchises (Doc. 2 at 3), but Pasqualetti's application was ultimately denied by Kia, which gave rise to this litigation.  (Doc. 2 at 8).  Pasqualetti applied to transfer the franchises on June 16, 2008.  (Doc. 2 at 3).  Kia then requested that he provide additional information and agree to build a new stand-alone Kia facility onsite within 12 months of his application being approved.  (Doc. 2 at 4).  Pasqualetti agreed and sent a $15,000 application fee. *Id.*  Kia then told Pasqualetti that the application fee was actually $40,000, and he sent an additional check for the deficit.  (Doc. 2 at 5).

Pasqualetti allegedly spoke with several Kia representatives, who assisted him with his application throughout the process.  (Doc. 2 at 5-6).  These representatives allegedly reassured him that his application would be approved shortly, and he went ahead with the logistics of the transfer.[1] *Id.*  Kia also assigned Pasqualetti a "dealer code" during the application process.  (Doc. 2 at 7).  On August 27, 2008, however, Kia sent correspondence to Pasqualetti informing him that his application had been denied because of his low customer satisfaction index ("CSI") at his current Chevrolet dealership.  (Doc. 2 at 6).

Despite Kia's discussions with Pasqualetti during the summer of 2008, it turns out that Kia

---

[1]Pasqualetti does not allege that he expended any monies other than the $40,000 application fee and a $350.00 payment to the American International Automobile Dealers Association (AIADA).  (Doc. 2 at 5).  Instead, Pasqualetti asserts that he expended effort by "finalizing the REPA due diligence regarding the business, real estate, meeting with computer experts, vendors, Kia sign company and future managers and employees."  (*Id.* at 6).

had already terminated its franchise with Varner on May 1, 2008. (Doc. 2 at 7). On August 1, 2008, Kia told Varner that, given this termination, he had no Kia franchise to transfer to Pasqualetti, or presumably to anyone. (Doc. 2 at 8). Varner did not tell Pasqualetti that he had no Kia franchise rights to transfer to him until September 3, 2008. (Doc. 2 at 8). Without Kia's approval of the franchise transfer, National City Bank refused to finance the transaction, forcing Pasqualetti to terminate the entire purchase transaction for all of the franchises. (Doc. 2 at 9).

Pasqualetti brings suit under Ohio law for the following:

Count I:        Injunctive Relief;

Count II:       Breach of Ohio Dealer's Act: Improper Notice & Lack of Good Cause;

Count III:      Breach of Ohio Dealer's Act: Untimely and Improper Rejection;

Count IV:       Breach of Ohio Dealer's Act: Lack of Good Cause;

Count V:        Breach of Ohio Dealer's Act: Failure to Perform Duties under the Act;

Count VI:       Breach of Fiduciary Duty;

Count VII:      Fraud and Misrepresentation;

Count VIII:     Tortious Interference with Business Relationships; and

Count IX:       Declaratory Judgment.

Plaintiff Pasqualetti is asserting nine counts, all of which arise under Ohio law. Pasqualetti and his company AAH&L are Ohio citizens, while Kia is a California corporation. The basis of this Court's subject matter jurisdiction is diversity of citizenship under 28 U.S.C. §1332. Accordingly, Ohio law applies to Pasqualetti's claims.

Before bringing this lawsuit, Pasqualetti filed a protest with the Ohio Motor Vehicle Dealers Board ("OMVD Board") on these same facts. After Kia's motion to dismiss sought to have

Pasqualetti's claims dismissed under an election of administrative remedies theory (Doc. 18 at 11), Pasqualetti, without acquiescing to Kia's legal assertion, dismissed his Board protest.  (Doc. 20 at 4).

Kia's Rule 12(b)(6) motion seeks to dismiss all of Pasqualetti's claims.

## II.    LAW AND ANALYSIS

### A.    LEGAL STANDARD

The Court may dismiss all or part of a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) is directed solely at the complaint itself.  *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983) (citing *Sims v. Mercy Hospital of Monroe*, 451 F.2d 171, 173 (6th Cir. 1971)).  When evaluating a complaint in light of a motion to dismiss, the Court must accept all of the plaintiff's well-pled allegations as true and resolve every doubt in the plaintiff's favor.  *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).

That said, a claim will be dismissed when it does not "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory. . . ." *Twombly*, 127 S. Ct. at 1969 (internal citations and quotations omitted, emphasis in original).  A court, moreover, is not entitled to accept "legal conclusions" or "conclusory allegations" as true.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *United States v. Salti*, No. 07-4487, 2009 U.S. App. LEXIS 19093, at *29 n.11 (6th Cir. August 25, 2009) (citing *Iqbal*, 129 S. Ct. at 1951).

Whereas prior to the Supreme Court's decision in *Iqbal*, a district court could disregard only those "allegations . . . sufficiently fantastic to defy reality as we know it," the Supreme Court recently

-4-

made clear that the bar is meaningfully higher.  *Courie v. Alcoa Wheel & Forged Prods.*, No. 07-4440, 2009 U.S. App. LEXIS 18561, at *4-5 (6th Cir. August 18, 2009) (citing *Iqbal*, 129 S. Ct. at 1949; *Iqbal*, 129 S. Ct. at 1959 (Souter, J., dissenting)).  To survive a motion to dismiss, the complaint must state "a plausible claim for relief."  *Iqbal*, 129 S. Ct. at 1950 (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).

## B.    DISCUSSION

Kia's motion to dismiss challenges the viability of Pasqualetti's claims.  Each claim will be addressed in turn.

### 1.    Breach of Ohio Dealer's Act: Claims Other than Lack of Good Cause

Pasqualetti asserts that Kia violated several provisions of the Ohio Dealer's Act (Ohio Revised Code §4517.56) and seeks damages and injunctive and declaratory relief. (Doc. 2).  In order to evaluate Pasqualetti's claims, however, the Court must first resolve an overarching defense asserted by Kia - that Pasqualetti may only bring one claim under the statutory scheme.  Kia argues that prospective franchisees, such as Pasqualetti, are only authorized by the statute (O.R.C. § 4517.65(B)) to bring a cause of action for damages based on the disapproval of transfer applications for other than good cause.  (Doc. 18 at 14-16; Doc. 22 at 4-7).  Kia seeks to have all other statutory claims dismissed.  *Id.*  Pasqualetti responds that the court should read the statute more liberally to allow prospective franchisees to sue for violations other than lack of good cause.  (Doc. 20 at 5).

-5-

The section of the Ohio Dealer's Act ("ODA") in question is §4517.65, entitled "Franchisor's liability to franchisee or prospective transferee."  It states:

> (A) When a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the <u>franchisee</u> in double the amount of actual damages sustained, plus court costs and reasonable attorney fees.

> (B) When a franchisor terminates, cancels, or fails to renew a franchise without the prior consent of the franchisee, or refuses to approve the sale or transfer of the business or a controlling interest in a franchisee <u>for other than good cause, the franchisee or prospective transferee may, in lieu of filing a protest with the motor vehicle dealers board, recover damages</u> under division (A) of this section.

O.R.C. § 4517.65(A-B) (2009) (emphasis added).

Kia supports its argument that prospective franchisees cannot bring "non-good cause" claims in court by citing *Bowshier v. DaimlerChrysler*, 3:03cv313 (S.D. Ohio Mar. 17, 2005) (unpublished in any format, electronic or otherwise) (Doc. 19-4).  *Bowshier* was one of several interrelated civil and administrative proceedings, cited by both Pasqualetti and Kia, involving Jack and Linda Bowshier.  The Bowshiers were prospective franchisees who had their transfer application denied by Chrysler.  *Id.* at 2.  The unpublished *Bowshier* opinion cited by Kia holds as follows: "The ability of a prospective transferee to recover damages is governed by subsection (B); however, that statutory provision authorizes a prospective transferee to recover damages <u>only for the franchisor's refusal to approve a sale or transfer for other than good cause</u>.  *Id.* at *12 (Doc. 19-4 at 13) (emphasis added).

Pasqualetti responds that the Court should allow other "non-good cause" statutory claims by highlighting the last phrase of O.R.C. § 4517.65(B), which states that prospective transferees can recover for "damages under division (A) of this section."  As Pasqualetti reasons, because division (A) provides franchisees with a damages cause of action for <u>any</u> violation of the statute, the Court

-6-

should read the Act to give prospective franchisees the same wide range of claims for any statutory violation.  Pasqualetti argues that, if this subsection (B) language referring to subsection (A) were read differently, it would be rendered superfluous.  (Doc. 20 at 5).

Pasqualetti counters *Bowshier*'s interpretation of the ODA by citing two cases, both of which imply that other statutory claims can be pursued in court: *Chrysler Corp. v. Ohio Motor Vehicle Dealers Board*, 2001 Ohio App. LEXIS 1455 (Ohio Ct. App., Franklin County Mar. 29, 2001) ("*Chrysler I*") (part of the Bowshier controversy) and *Ganley v. Subaru of America*, 2008 Ohio 3588, at *39 (Ohio Ct. App., Medina County July 21, 2008).  The *Chrysler I* court stated that the "election of remedies" provision of Section 4517.65(B) "does not apply to disputes regarding the timeliness of the notice given by the franchisor as required in R.C. 4517.56(B)."  2001 Ohio App. LEXIS 1455 at *14.  It went on to note that, "Bowshier was not barred by R.C. 4517.65(B) from filing her dispute regarding timeliness in both the administrative forum and the court." *Id.* at *15 (emphasis added). Therefore, at least by implication, Pasqualetti argues that the Ohio Appellate Court in *Chrysler I* construed Section 4517.65(B) as providing prospective transferees with at least one additional claim - for violations of the Section 4517.56(B) timeliness provision.  Therefore, Pasqualetti argues that his Section 4517.56(B) claims (essentially, Counts II and III) should not be barred.

Looking at the entire ODA, the Court notes that other sections do impose statutory duties on franchisors with respect to prospective franchisees, including that they "shall provide the franchisee and the prospective transferee with written notice." ORC 4517.56(B).  The only section authorizing a lawsuit for damages by a prospective transferee, however, is Section 4517.65(B).  In looking at the plain language of the statute, the Court reads the ODA as allowing prospective franchisees to pursue these other statutory violations by bringing OMVD Board protests.  Damage actions in court, on the

other hand, are only authorized for violations of the good cause provision, not to enforce any other statutory franchisor duty.

The Court is unpersuaded by *Chrysler I*'s interpretation of the statute, and finds that the *Bowshier* court's reading of the statute is the more logical interpretation of the ODA's plain language.  Subsection (A) gives a "franchisee" a cause of action for damages for any violation of the Act, while the words "prospective transferee" only appear in subsection (B), giving a cause of action based solely on lack of good cause.  O.R.C. § 4517.65(A-B).  If the Ohio legislators had wanted to give prospective franchisees the same wide range of damage actions as they give to current franchisees, then they could have simply added "or prospective transferees" to subsection (A).

The fact that subsection (B) refers back to subsection (A) when discussing recoverable damages, does not, as Pasqualetti contends, extend the scope of activities giving use to such damages for prospective transferees.  The reference to subsection (A) in subsection (B) merely defines the scope of damages - i.e., double damages, costs and attorneys fees - where a right to recovery under subsection (B) is established.

 Furthermore, while *Chrysler I* and *Bowshier* dealt with the same factual circumstances, from a procedural standpoint, *Bowshier* is the more analogous case.  In *Chrysler I*, Linda Bowshier was appealing an OMVD Board decision.  2001 Ohio App. LEXIS 1455.  By contrast, her husband in *Bowshier* was bringing a damages cause of action in federal district court.  As in the case at bar, the *Bowshier* court dismissed his claim because the plain language of the statute did not authorize prospective franchisees to bring "non-good cause" claims in court.  (Doc. 19-4 at 12-13).

Prospective franchisees may bring administrative protests based on other violations of the ODA, including for untimely notice, but §4517.65(A-B) only authorizes lawsuits for damages based

on violations of the good cause provision.  Accordingly, all of Pasqualetti's ODA statutory claims other than for lack of good cause are **DISMISSED**.[2]

### 2.      Election of Remedies - Injunctive Relief

#### i.      Ohio Dealer's Act Claims

Citing the same Section 4517.65(A-B) statutory language, Kia also moves to have any prayers for injunctive or declaratory relief barred by the Court.  (Doc. 22 at 2-4).  Kia urges the Court to apply the subsection's purported "election of remedies" language to preclude Pasqualetti from bringing any action not for damages.  As Kia reasons, since Pasqualetti has dismissed his OMVD Board protest, he has elected to forgo any claims for relief other than for damages.  *Id.*

In his opposition brief, Pasqualetti states that the parties have "entered into a stipulation in which Plaintiff[s] agreed to withdraw their motion for preliminary injunction without prejudice.  Consequently, the issue of injunctive relief is not before the court at this time."  (Doc. 20 at 9).  While Pasqualetti appears to have waived his claims for preliminary injunctive relief, as Kia points out in its reply, Pasqualetti's current complaint still contains claims for injunctive and declaratory relief.  (Doc. 22 at 3).  Therefore, the Court must address whether Section 4517.65(A-B) bars non-legal remedies in court.

Once again, the language in question states that a "prospective transferee may, <u>in lieu of filing a protest</u> with the motor vehicle dealers board, recover damages."  O.R.C.  §4517.65(B) (emphasis added).  Kia interprets this election of remedies provision as precluding non-damages claims in court, and supports its assertion by citing to an unpublished Sixth Circuit opinion, *Evans*

---

[2]Counts III, V, and the parts of II and IV that do not address Pasqualetti's good cause claims are **DISMISSED**.

*v. Saab Cars USA*, 1994 U.S. App. LEXIS 11747 (6th Cir. May 17, 1994).  There, the Court stated that the ODA "requires that the protestor make an election to pursue either an administrative remedy or a damages remedy."  *Id.* at *4.

*Chrysler Corp. v. Ohio Motor Vehicle Dealers Board* ("*Chrysler I*") follows *Evans*, stating that the "phrase 'in lieu of,' in division (B), indicates that the party must elect either a court action for double damages or the administrative protest in regard to the listed issues."  2001 Ohio App. LEXIS 1455 at *13.  The *Chrysler I* court continues that either the court or the Board can make a determination, and "they can provide different remedies, but the party must elect which remedy to pursue."  *Id.* at *14.

Pasqualetti's main rebuttal, as mentioned in Section 1, is that the *Chrysler I* court also states that this "election of remedies" provision "does not apply to disputes regarding the timeliness of the notice given by the franchisor as required in R.C. 4517.56(B)."  Because the Ohio Appellate Court noted that the Bowshiers, who were prospective franchisees, could have pursued their "timeliness of notice" claims before either the court or the Board, Pasqualetti reiterates that the statute should be read to allow non-legal remedies for violations of 4517.56(B).  (Doc. 20 at 4).

Pasqualetti also cites to *Ganley*, which found that "a party may seek simultaneous relief for violations of the [ODA] before the court of common pleas and the OMVDB."  2008 Ohio 3588 at *39 (citing *Chrysler I*, 2001 Ohio App. LEXIS 1455).  "[I]f one forum proceeded to determine [an issue, however,] the determination would likely have preclusive effect and would prevent relitigation under the theory of res judicata or collateral estoppel." *Id.*  The defendant in *Ganley*, in fact, sought the identical determination that Kia seeks in this case: that the "ODA requires franchisees to elect a remedy and seek injunctive relief before the OMVDB or seek damages from a trial court."  *Id.* at

12. The *Ganley* court did not reach a decision on that issue, however, relying instead on the res judicata effect of the Board's holding that the franchise agreement had been properly terminated before the plaintiff entered into the buy-sell agreement. *Id.* at 44.

Assuming *arguendo* that Pasqualetti's waiver of injunctive relief (Doc. 20 at 9) related only to his request for <u>preliminary</u> injunctive relief, the Court finds, in reading the plain language of the statute, that Section 4517.65(B)'s election of remedies provision bars Pasqualetti from seeking non-legal remedies in court. The statute only authorizes a prospective transferee to bring a cause of action, "in lieu of filing a protest" with the Board, for <u>damages</u>. O.R.C. §4517.65(B). If Pasqualetti had wanted to seek injunctive or declaratory relief, he could have continued his Board protest. *Evans* and *Chrysler I* are persuasive on this issue. Both courts concluded, at least to some extent, that a prospective transferee must make an election between pursuing an "administrative remedy or a damages remedy."[3] *Evans*, 1994 U.S. App. LEXIS 11747 at *4; *Chrysler*, 2001 Ohio App. LEXIS 1455 at *13-14.

As explained above, Pasqualetti argues that the Court should instead follow *Chrysler I*'s caveat that this election of remedies provision does not apply to the "timeliness of notice" provision. This Court, however, finds that *Chrysler I*'s selective interpretation of the statute is incorrect. The ODA's election of remedies provision applies to all potential statutory claims. The timeliness provision is no exception.

Even assuming that the Court followed *Chrysler I*'s recognition of a prospective transferee's right to seek relief in Court premised on a franchisor's untimely denial, the Court must still dismiss

---

[3]While *Evans* did not explicitly say "injunction," but rather used the word "administrative remedy," the Court still reads that holding, coupled with the plain language of the ODA, as precluding all non-damages prayers for relief under the ODA.

-11-

Pasqualetti's claims.[4]  When looking at timeliness objections in the context of a claim under §4517.56(B), "the ultimate issue is whether good cause exists to refuse to approve a sale or transfer. [] Hence, the franchisor's failure to strictly comply with certain notice requirements in R.C. 4517.56 is but one factor to be considered in determining whether good cause exists." *Chrysler Corp. v. Bowshier*, 2002 Ohio 1443, at *13-14 (Ohio Ct. App., Franklin County Mar. 28, 2002) ("*Chrysler II*").  This makes clear, counter to Pasqualetti's position, that the ODA does not create an independent claim assertable in court based on the absence of timely notice.  *Chrysler II* correctly explains that a court may consider timeliness issues in the context of the overall assessment of whether good cause exists to justify a refusal to issue or transfer a franchise - i.e., it found the absence of timeliness probative, though not determinative, of the issue of good cause.  Accordingly, untimeliness does not, on its own, support a claim under R.C. 4517.56.

### ii.    Common Law Claims

Pasqualetti argues that, while his ODA claims for injunctive relief may be barred by the statute's election of remedies provision, he may still seek an injunction based on his common law claims because *Chrysler I* noted "that there is no dispute that trial courts can adjudicate the parties' common-law claims and have the power to order injunctive relief, authority that the board does not have." 2001 Ohio App. LEXIS 1455 at *15.  Thus, he asserts that his claims for breach of fiduciary duty, fraud, and tortious interference with business relations would all justify the injunctive relief he seeks - i.e., an order declaring that Kia may not rely upon either customer satisfaction criteria or

---

[4]To succeed on such a claim, Pasqualetti would also have to "show that he was prejudiced by [the franchisor's] failure to follow the notice provisions."  *Nissan Motor Corp., U.S.A. v. Dever*, 2000 Ohio App. LEXIS 1240, at *22 (Ohio Ct. App., Franklin County Mar. 28, 2000).  In fact, it is debatable whether Pasqualetti has presented a plausible claim of prejudice resulting from untimely notice.  The Court, however, must accept Pasqualetti's assertion of prejudice as true given the procedural posture of this matter.

the use of Kia's store average performance standard to deny a franchise to Pasqualetti.  As explained below, all of Pasqualetti's common law claims, except for fraud, must be dismissed.  Therefore, he may not assert a right to relief for injunctive or declaratory remedies under *Chrysler I* based on those dismissed claims.

In regard to Pasqualetti's fraud claim, moreover, the Court finds that any form of injunctive relief would be inappropriate because, even if Pasqualetti prevails on his fraud claim, he is still only entitled to relief that is directly attributable to the fraud itself.  *See Hauck v. Yockey*, No. 87AP-795, 1988 Ohio App. LEXIS 3613, at *6 (Ohio Ct. App., Sept. 1, 1988); *accord Koerner v. Aetna U.S. Healthcare, Inc.*, 92 Fed. Appx. 394, 396 (9th Cir. 2003) ("[A] fraud claim requires proof of damages arising out of misrepresentation.").  Yet, any injunction based on fraud would ultimately ask the Court to force Kia to turn over a franchise to Pasqualetti.  From a conceptual standpoint, the Court could not issue such a broad remedy based on Pasqualetti's fraud claim because such a remedy would not flow from the injury suffered - i.e., even in the absence of the fraud alleged, Pasqualetti would have never received a Kia franchise.  (Doc. 2 at 8).[5]  Therefore, the Court will not issue an injunction based on the alleged fraud.

Accordingly, any claims for injunctive or declaratory relief sought by Pasqualetti are **DISMISSED**.

---

[5]As the Court discusses below, Pasqualetti asserts that Kia defrauded him by failing to disclose termination of the Courtesy franchise while making demands upon Pasqualetti's time and finances for the purpose of inducing him to withdraw his transfer application.  Even if true and actionable, Pasqualetti's damages for that allegedly tortious activity would be limited to the harm suffered because Pasqualetti did not know sooner that his request for a franchise was doomed from the start.  An order awarding a franchise simply would not be a viable remedy for the fraud alleged.

-13-

### 3.     Breach of Ohio Dealer's Act: Good Cause Provision

It appears from the parties' briefing that Kia has conceded that Pasqualetti has a plausible claim based on its denial of Pasqualetti's transfer application for other than good cause.  In fact, Kia's motion to dismiss and reply brief both focus on why Pasqualetti's good cause claim is the only viable statutory claim alleged.  (Doc. 18 at 14-16, Doc. 22 at 4-7).  Therefore, the Court finds that Kia has affirmatively abandoned any attempt to dismiss this claim.

Kia's only potential argument against the good cause claim is found in footnote 3 in its motion to dismiss.  (Doc. 18 at 13 n.3).  There, Kia argued that Pasqualetti's election to pursue his good cause claim before the Board precluded him from bringing an action in court. Footnote 3 states:

> [Kia] does not concede that Plaintiffs have filed a valid protest before the Board.  To the contrary, [Kia] maintains that Plaintiffs have no valid claim because (i) the franchise that Plaintiffs sought to acquire was subject to a notice of termination and could not, in any event, be transferred 'free and clear' of such notice, and (ii) such termination has already taken effect.

*Id.*

The "burden of proof to establish the franchisor's good cause shall be on the franchisor," O.R.C. §4517.65(D), and yet, Kia has presented no argument explaining why its denial was based on good cause.  More importantly, while Kia's footnoted argument may assert a potential defense to a Board protest, it does not necessarily affect a Court's good cause analysis.  Since Pasqualetti had dismissed his Board protest before Kia filed its reply, the Court assumes that Kia's failure to attack that claim further on reply is an abandonment of its motion to dismiss with respect thereto.

Therefore, Kia's motion to dismiss Pasqualetti's good cause claims (parts of Counts II and IV) is **<u>DENIED</u>**.

4.      **Breach of Fiduciary Duty**

Pasqualetti alleges that Kia breached its fiduciary duties by (1) failing to comply with the ODA procedures for evaluating franchise transfers, (2) breaching its contractual duties under its original franchise agreement with Courtesy, and (3) failing to properly advise Pasqualetti throughout the transfer application process.  (Doc. 2 at 15; Doc. 20 at 6).  Pasqualetti asserts that a fiduciary relationship was formed between Kia and himself through (1) the ODA, (2) the original Courtesy franchise contract, and (3) Kia's active involvement with Pasqualetti during the application process. *Id.*

In response, Kia counters that the ODA creates a regulatory scheme, replacing any common law fiduciary duty.  (Doc. 18 at 18).  Furthermore, Kia asserts that, not only does Pasqualetti lack "standing" under the original franchise agreement (because he is not in privity of contract with Kia), but franchise agreements do not create fiduciary relationships in any event.  (Doc. 18 at 19).  In fact, Kia points to the contract itself, which expressly disclaims any fiduciary duties in any event.  *Id.* Finally, Kia responds that the interaction its representatives had with Pasqualetti could not give rise to a fiduciary relationship because of the inherent conflict of interest between the parties during their arms-length interaction.  (Doc. 22 at 8).

Pasqualetti's response is that Kia's representatives created a fiduciary relationship by helping him with his application, "aiding and encouraging him" during the process, and "making assurances that the application would be approved."  (Doc. 20 at 6).

i.      **Fiduciary Relationship Requirement**

Under Ohio law, Pasqualetti must show the following elements to prove a breach of fiduciary duty: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the

duty; and (3) an injury resulting proximately therefrom." *Werthmann v. DONet, Inc.*, 2005 Ohio 3185, *43 (Ohio Ct. App., Montgomery County June 24, 2005) (internal citation omitted).  Kia focuses on the first element, asserting that no fiduciary relationship existed between it and Pasqualetti.  (Doc. 22 at 8).  Without a fiduciary relationship, Kia would owe no duty that could be breached.  *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 554 F.Supp.2d 821, 826-827 (S.D. Ohio 2008).

Pasqualetti asserts that a fiduciary relationship was formed between himself and Kia on several grounds, and the Court will address each in turn.  First, Pasqualetti's complaint points to the ODA as establishing a fiduciary relationship, but his opposition brief does not assert any specific arguments explaining why the Act creates such a fiduciary duty.  (Doc. 2 at 15).  Kia, on the other hand, points to *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos.*, 67 Ohio St. 3d 274 (Ohio 1993) to rebut Pasqualetti's assertion.  (Doc. 18 at 18).

In *Belvedere*, the Ohio Supreme Court held that the Ohio Condominium Act (O.R.C. §5311) did not create a fiduciary relationship "between developers and owners, developers and owners' associations, or developers and purchasers."  *Id.* at 284.  "A fiduciary may not possess an interest of any sort that might conflict with an interest of the person to whom he or she owes a duty."  *Id.* Because of the inherent conflicts of interest between those parties, the court concluded that the parties covered by the Act did not owe each other fiduciary duties.  *Id.*  Rather, the statutory scheme imposed duties on each party and replaced any common law fiduciary duties.  Otherwise, the statutory remedies would be rendered "superfluous because developers could simply be sued under the common law."  *Id.*

Kia's argument that the ODA does not create a fiduciary relationship between franchisors and prospective franchisees is well taken. The reasoning applied in *Belvedere*, holding that the Ohio Condominium Act did not create a fiduciary relationship, provides a strong analogy. Kia and Pasqualetti are actors whose behavior is regulated by the ODA, and whose interests during the application process are inherently in conflict. Kia was trying to protect itself from a potentially poor new franchisee, while Pasqualetti was seeking approval, presumably at all reasonable costs. The ODA's statutory provisions, moreover, provide the proper basis to remedy violations, rather than suing for common law breach as of a fiduciary duty.

Second, Pasqualetti asserts that a fiduciary relationship was formed through Kia's franchise agreement with Courtesy. This assertion, however, fails to assert a plausible fiduciary relationship for several reasons. As Pasqualetti asserts in the complaint, that agreement was terminated prior to any direct discussions between Pasqualetti and Kia - i.e., as of May 1, 2008. Pasqualetti pleads no facts, moreover, establishing privity of contract between himself and Kia through the Courtesy agreement; he, therefore, lacks "standing" to sue under the Courtesy franchise contract. Furthermore, as a general rule, "franchise agreements do not give rise to fiduciary or confidential relationships between the parties." *Costello v. Lungaro*, 1995 U.S. App. LEXIS 10905, *10 (6th Cir. May 11, 1995) (unpublished) (citing *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341, 1349 (6th Cir. 1988)). And, the franchise agreement in question expressly states that "[n]o fiduciary obligations are created by this agreement." (Doc. 19-6 at 35, Article XVI(B)). For these reasons, the Court concludes that no fiduciary relationship was created between Kia and Pasqualetti based on the franchise agreement.

-17-

Third, Pasqualetti asserts that Kia's interaction with him during the application process created a fiduciary duty.  The vast majority of business relationships, however, do not give rise to a fiduciary relationship.  *See Blon v. Bank One, Akron, N.A.*, 35 Ohio St. 3d 98, 101 (Ohio 1988).  A "fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."  *Comtide Holdings*, 554 F.Supp.2d at 826-827 (citing *In re Termination of Employment of Pratt,* 40 Ohio St.2d 107, 321 N.E.2d 603, 609 (Ohio 1974)).

Accepting Pasqualetti's allegations as true, as the court must, he imposed a special trust in Kia's representatives.  A party cannot, however, <u>unilaterally</u> elevate a relationship to a fiduciary level.  *Cedar View, Ltd. v. Colpetzer*, 2006 U.S. Dist. LEXIS 7018, *8 (N.D. Ohio Feb. 24, 2006).  "[B]oth parties must understand that a special trust or confidence has been reposed."  *Id.* (citing *Anchor v. O'Toole,* 94 F.3d 1014, 1024 (6th Cir. 1996)).  No fiduciary relationship is created, moreover, where the parties interact at "arms length, each protecting his own interest."  *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282, 287 (Ohio 1979).  Under such circumstances, it would be unreasonable for either party to expect the other to act as their fiduciary.  *Id.*

As explained above, Kia and Pasqualetti had conflicting interests during the transfer application process.  During their arms-length interaction, both parties were acting in their own best interest.  Therefore, the Court finds that no fiduciary relationship was formed between the parties.  Count VI for Breach of Fiduciary Duty is **DISMISSED**, accordingly.

### 5.    Fraud and Misrepresentation

Pasqualetti avers that "Kia made several false material representations and omissions . . . regarding the status of their dealer application and the availability of the Courtesy CPD franchise."

(Doc. 2 at 16).  He goes on to claim that these "false representations and omissions were made with the intent to induce [him] to rely upon them."  *Id.*  Kia's rebuttal is that Pasqualetti has failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  (Doc. 18 at 21).  Kia asserts that Pasqualetti has not pled the following: who made the alleged fraudulent statements, what statements were made, when or where they were made, or what the fraudulent intent was behind them.  *Id.*

In response, Pasqualetti reiterates the policy behind Rule 9(b) - that the defendant must simply receive meaningful notice.  He claims that the pleadings fulfill that low threshold.  (Doc. 20 at 7).  Pasqualetti also characterizes Kia's argument as asking the Court to inappropriately demand that plaintiffs go beyond merely pleading fraud with particularity and instead, provide evidence establishing fraud.  *Id.*

### i.    Pleading Fraud with Particularity

Federal Rule of Civil Procedure 9(b) requires "that a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  While the Sixth Circuit has interpreted the particularity requirement liberally, the plaintiff must at least "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-162 (6th Cir. 1993) (internal citations and quotations omitted).  These particularity requirements must be considered, but the ultimate question is whether the complaint puts the defendant on "sufficient notice of the misrepresentation," enabling them to respond to the allegations of fraud in an informed manner.  *Id.* (quoting *Brewer v. Monsanto Corp.*, 644 F. Supp. 1267, 1273 (M.D. Tenn. 1986)).

The elements of fraud are as follows: "(1) false representation of a material fact; (2) knowledge of or belief in its falsity by the person making it; (3) belief in its truth by the person to whom it is made; (4) intent that it should be acted upon; and (5) detrimental reliance upon it by the person claiming to have been deceived." *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 819 (N.D. Ohio 2004).

Kia argues that Pasqualetti's complaint lacks particularity because it does not plead the "who, what, where, why, and when" of the alleged fraud. (Doc. 18 at 15). In support of its argument, Kia cites *Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F. Supp. 2d 286 (S.D. Ohio 2000). In *Sky Tech.*, the court stated that "[g]eneralized accusations of wrongdoing attributed to 'defendants' without any specificity as to <u>which employees</u> of the defendants were engaged in the alleged fraudulent scheme, are not sufficient." *Id.* at 299 (citing *United States v. Mercy Health Sys. Of Southwest Ohio*, 188 F.3d 510 (table decision) (6th Cir. 1999) (internal quotation marks omitted; emphasis added)). The *Sky Tech.* plaintiff SKY pled as follows:

> Through its statements and actions, MRI and ChemSource continued to lead SKY to believe that MRI and ChemSource would use the SKY-developed site and honor the terms of their contract even after MRI and ChemSource retained another firm to develop an alternate site. Throughout this period, MRI and ChemSource had no intention of issuing stock to SKY, paying SKY's bill or using the completed site created by SKY. Sky acted in reliance on MRI's and ChemSource's continued misrepresentations. MRI and ChemSource's actions and representations throughout this period constitutes fraud.

*Id.*

The *Sky Tech.* court concluded that these allegations failed to plead fraud with particularity because the plaintiff did not "articulate the contents of defendants' allegedly fraudulent statements, [failed] to identify those employees or representatives of the defendants who made the allegedly fraudulent statements, [and did not] allege when or where these statements may have been made."

-20-

*Id.*  Kia further reiterates its argument by citing *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998) (finding a complaint deficient because it failed to plead the specific fraudulent statements and speakers involved).

Pasqualetti counters by emphasizing that the "purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *In re Revco Sec. Litigation*, 1991 U.S. Dist. LEXIS 20715, *20 (N.D. Ohio Dec. 12, 1991).  Furthermore, Pasqualetti reiterates that Rule 9(b) "requires only that the 'circumstances' of the fraud be pled with particularity, not the evidence of the case." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988) (emphasis added).  In *Michaels Bldg.*, the only information missing from the plaintiff's complaint was "the identities of borrowers who received sub-prime loans [and were, therefore, fraudulently favored] -- information which [was] in the hands of the defendant." *Id.*  Accordingly, the *Michaels Bldg.* court concluded that the complaint did plead fraud with sufficient particularity. *Id.* at 681.

In order for the Court to determine whether Pasqualetti has failed to plead facts establishing fraud with particularity, the Court must go through all of the allegations relating to the alleged fraud. Pasqualetti asserts the following in his complaint:

> During the application process, Pasqualetti "relied on the expertise and help of Kia employees drafting correspondences with the additional information and providing the right information" requested by Kia. (Doc. 2 at 5).  These Kia employees' "help" included "reviewing and revising correspondences and information and providing preliminary approvals of all the additional information . . . These Kia employees were directly responsible for approving or denying Pasqualetti's application." *Id.*  "Kia's employees . . . stated in various communications that the explanations were very good and sufficiently addressed Kia's questions.  At no time was Pasqualetti ever informed that Kia, allegedly, had standards" regarding dealer's CSI effectiveness or how those standards were determined. *Id.* at 6.  "Pasqualetti was led to believe that the Kia 'region' had approved his application" and that the corporate headquarters' approval "was just a formality."  Kia assigned Pasqualetti a "dealer code," which it

-21-

uses to identify dealers in Kia's system in order to conduct business.  Pasqualetti viewed the assignment of a "dealer code" as indicating that his approval was forthcoming.  *Id.* at 7.  "During the entire period of time that Kia was demanding that Pasqualetti keep on providing additional information and representing that everything was going to be approved . . . Kia had terminated the franchise of Varner on May 1, 2008."

*Id.*

Through these allegations, Pasqualetti has averred the following legal theory: Kia committed fraud by omission - i.e., Kia knew that it had already terminated its relationship with Varner before Pasqualetti's application was filed, but Kia never informed Pasqualetti of this termination or the resulting impact that termination might have on Pasqualetti's ability under Ohio law to seek a franchise.  Pasqualetti, therefore, views Kia's requests for additional money and several requests for additional information during the application process as mere attempts to force Pasqualetti to withdraw his application so that Kia might avoid its own obligations to potential transferees under Ohio law.  (Doc. 2 at 8).  Pasqualetti asserts that Kia used the CSI effectiveness issue as a mere pretense to "steal the franchise" after Kia's attempt to force him to withdraw failed.  *Id.*

Kia is correct to highlight that Pasqualetti's allegations do not name any specific employee who made the alleged fraudulent statements, nor do they address the particular time, place, and contents of those statements.  The Court, however, in evaluating the allegations in the light most favorable to Pasqualetti, finds that the complaint has pled fraud with sufficient particularity for purposes of Rule 9(b).  As explained in *Michaels Bldg.*, plaintiffs are not required to provide evidence, only to allege facts establishing fraud with particularity.  848 F.2d at 680.  The evidence Kia argues is missing from the complaint, moreover, is evidence that is uniquely in Kia's possession and easily obtainable through discovery.  Kia is essentially demanding that plaintiffs take meticulous notes during regular conversations for fear that the other party might be defrauding them.  This

position misconstrues the particularity requirement, however, and asks the Court to incorrectly focus on the complaint's form over its substance.

While the facts in *Sky Tech.* appear similar to the case at bar, the circumstances here are sufficiently different to justify a contrary result. Among other things, the plaintiffs there did not articulate a specific fraudulent scheme and intent. By contrast, Pasqualetti has articulated a plausible fraudulent intent and scheme based on Kia's continued reassurances even after it had terminated Varner's franchise. The key to the particularity requirement is giving defendants meaningful notice, *Coffey*, 2 F.3d at 161-162, and Pasqualetti's complaint accomplishes that purpose.[6] Therefore, Kia's motion to dismiss Count VII for Fraud and Misrepresentation is **DENIED**.[7]

### 6. Tortious Interference with Business Relations

Pasqualetti alleges that Kia's denial of his transfer application tortiously interfered with several business relationships, including his APA, REPA, and financing agreement with National City Bank. (Doc. 2 at 17; Doc. 20 at 9). In response, Kia states that it cannot be held liable for interfering with a contract to which it was a party (Doc. 18 at 17), but Pasqualetti counters that Kia was not a party to those three contracts. (Doc. 20 at 8-9). Kia then responds that, because its only

---

[6]Of course, if discovery does not bear out Pasqualetti's claims as to the facts of the assertions or omissions upon which he relies, the materiality thereof, Kia's intent to deceive, or Pasqualetti's reasonable reliance thereon, judgment as a matter of law might still be available to Kia on these claims. The Court does not find, however, that it is appropriate to terminate these claims at this stage of the proceedings.

[7]The scope of Pasqualetti's alleged fraud damages based on his reasonable reliance is unclear, however. Plaintiffs, of course, may only recover damages directly attributable to the fraud itself. *See Hauck v. Yockey*, No. 87AP-795, 1988 Ohio App. LEXIS 3613, at *6 (Ohio Ct. App., Sept. 1, 1988); *accord Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 373, 395 (8th Cir. 1993) ("An essential element of a fraud claim is proof of damages proximately caused by the misrepresentation.").

-23-

action was to refuse to enter into a franchise agreement with Pasqualetti, any external consequences on other contracts resulting from that decision cannot lead to tort liability.  (Doc. 22 at 11).

In *Kenty v. Transamerica Premium Ins.*, 72 Ohio St. 3d 415, 419 (1995), the Ohio Supreme Court adopted the Restatement analysis and recognized that Ohio has a cause of action for tortious interference.  Section 766 of the Restatement (Second) of Torts defines "Intentional Interference with Performance of Contracts by Third Parties" as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts §766.  Under Ohio law, "to establish a claim for tortious interference with a business relationship, a party must show: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages."  *Bowshier v. Chrysler Financial Corp.,* 144 F.Supp.2d 919, 926 (S.D. Ohio 2001) (citing *A & B-Abell Elevator v. Columbus/Cent. Ohio Bldg.*, 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995)).

An action for tortious interference, however, may only lie against an <u>outside</u> party.  A party cannot, obviously, interfere with its own contract because that would substitute tort law for contract law.  Indeed, "where a sale of a franchise [] is subject to the approval of a franchisor pursuant to a contract between the seller and the franchisor, the franchisor cannot be characterized as an 'outsider'

-24-

to the proposed transaction and thus is not subject to a claim of tortious interference.'"[8] *Cook v. Little Caesar Enters.*, 972 F. Supp. 400, 415 (E.D. Mich. 1997), *aff'd*, 210 F.3d 653, 659-660 (6th Cir. 2000). The Sixth Circuit affirmed the district court's decision, explaining that a claim for tortious interference is precluded against a party to a contract. 210 F.3d at 659-660.

Furthermore, even absent a contract, "[t]he tort of willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with." *Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. Dist. Ct. App. 3d Dist. 1986) (citation omitted) (Because the plaintiffs' agreement with a third party was "specifically conditioned upon [the defendant's] approval, as a matter of law, [the defendant] cannot be liable for tortious interference with their agreement."); *see also Noller v. GMC Truck & Coach Div., General Motors Corp.*, 244 Kan. 612, 620 (Kan. 1989) (affirming "summary judgment because the alleged interference did not arise from a relationship between [the plaintiff] and a third person, but from [the plaintiff's] potential relationship with [the defendant franchisor] via the prospective franchise agreement.").

Kia's primary argument is that it was simply a franchisor exercising contractual rights to refuse to enter a new agreement with a prospective franchisee, and any alleged wrongdoing flows from that relationship. Therefore, Kia asserts that it was not an "outsider" to the contracts in

---

[8]The district court looked to the Restatement (Second) of Torts Section 766B for guidance and concluded that no tortious interference claim could be maintained. 972 F. Supp. at 415. Section 766B is nearly identical to Section 766, which has been adopted in Ohio. §766 states: "One who intentionally and improperly interferes with another's prospective contractual relations (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts §766B.

-25-

question and cannot be held liable for any consequences resulting from its denial of Pasqualetti's application.  While there does not appear to be any Ohio case directly on point, the Court is persuaded by the Sixth Circuit's affirmation of *Cook*, along with the *Genet* and *Noller* opinions.  A franchisor does not act as a "third party" or "outsider" when approving or denying a prospective franchisee's application.  Any effect that decision might have on other contracts, in particular, contracts that are contingent upon that decision, cannot rise to the level of tortious interference.

Kia was the source of the franchise opportunity being sought, and therefore, not an outsider or third party to the contract.  *Accord Genet*, 498 So. 2d 683.  Pasqualetti's APA, REPA, and financing contracts were all inherently contingent upon approval of the Kia franchise transfer.  The APA, in fact, was expressly contingent upon Kia's approval (Doc. 2-1 at 14), and the complaint states that National City's "financing was specifically contingent on Pasqualetti obtaining all of the franchises, especially Kia." (Doc. 2 at 4).  Because those three agreements, which Pasqualetti alleges were interfered with, were all contingent upon Kia's approval of the transfer, Kia cannot be held liable for "interfering" with them.  *Accord Genet*, 498 So. 2d 683.

As a matter of public policy, moreover, franchisors should not fear potential tort liability for simply deciding not to contract with a prospective franchisee.  *See Latino Food Marketers, LLC v. Ole Mexican Foods, Inc.*, 2004 U.S. Dist. LEXIS 5249, at *39-40 (W.D. Wis. Mar. 29, 2004) ("Defendant cannot use contract negotiations to impose a tort duty on plaintiff."); *accord Board of Trustees of the Worthington Pub. Library v. Hickson Corp.*, No. C2-98-1073, 1999 U.S. Dist. LEXIS 21167, at *3 (S.D. Ohio Sept. 8, 1999) ("Tort and contract law normally occupy distinct spheres.") *accord also Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Electric Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) ("Tort theories and contract theories must be kept distinct." (quotation

omitted)).  Parties, like Kia, should be free to enter or not enter contracts with others.  The law of

contracts, not the law of torts, provides parties with potential remedies under such circumstances.

*See Cal. Joint Powers Ins. Auth. v. Munich Reinsurance Am., Inc.*, 2008 U.S. Dist. LEXIS 56654

(C.D. Cal. Apr. 21, 2008) ("Because the covenant of good faith and fair dealing essentially is a

contract term that aims to effectuate the contractual intentions of the parties, compensation for its

breach has almost always been limited to contract rather than tort remedies. [California's exception

providing tort remedies for breaches that violate social policy is a] major departure from traditional

principles of contract law."); *c.f. Sec. First Network Bank v. C.A.P.S., Inc.*, No. 01-C-342, 2003 U.S.

Dist. LEXIS 17796, at *22 (N.D. Ill. Oct. 7, 2003) ("[The plaintiff] confuses tort and contract

liability.").

 For the reasons stated above, the Court holds that Pasqualetti has failed to plead a plausible

claim for tortious interference with business relationships.  Count VIII is **DISMISSED**, accordingly.

### III. CONCLUSION

 Defendant Kia Motors America, Inc.'s Motion to Dismiss (Doc. 18), as explained above, is

**GRANTED in part** and **DENIED in part**.  Kia's Motion to Dismiss is **GRANTED** as to Counts

I, III, V, VI, VIII, and IX, and as to Counts II and IV to the extent they do not address Plaintiff

Pasqualetti's claims that Kia denied the transfer for other than good cause.  Kia's Motion to Dismiss

Count VII for Fraud and Misrepresentation, and Pasqualetti's Ohio Dealer's Act "good cause"

claims, to the extent the motion can be read to address such claims, is **DENIED**.

 The parties shall confer and submit a proposed Case Management Plan within 5 days of this

opinion being issued.  The Court will then issue a Case Management Plan governing these

proceedings.  The Court encourages the parties to consider options designed to expedite these

proceedings.

      **IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 30, 2009**